**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JIAXING ZICHI TRADE CO., LTD, | Case No.: 1:21-cv-00973 |
| Plaintiff, | Hon. Martha M. Pacold |
| v. | Magistrate Judge Hon. Young B. Kim |
| LING YANG, d/b/a Emperor Goose, CAO ZI QI, d/b/a FADSHOW, and SHANSHAN MA, d/b/a Raddzo, and DOES 1-50, inclusive, | |
| Defendants. | |

**PLAINTIFF'S *EX PARTE* MOTION FOR ENTRY OF A (1) TEMPORARY RESTRAINING ORDER, (2) ASSET RESTRAINING ORDER, (3) EXPEDITED DISCOVERY ORDER AND (4) SERVICE OF PROCESS BY ELECTRONIC MEANS ORDER**

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS ......................................................................................3

    I.  The Orolay® Jacket aka the Amazon Coat .....................................................3

    II.  Defendants' Illegal Activities .......................................................................5

III.  ARGUMENT ..........................................................................................................8

    I.  Standard for Temporary Restraining Order and Preliminary Injunction .................9

    II.  Plaintiff Will Likely Succeed on the Merits ..........................................................10

        I.  Plaintiff Is Likely to Succeed on Its Trade Dress Infringement Claim......10

            1.  Plaintiff's trade dress is valid because it has developed a secondary meaning .................................................................................................11

            2.  Plaintiff's trade dress is non-functional ...................................................13

            3.  Consumers are likely to be confused .......................................................16

        II.  Plaintiff Is Likely to Succeed on Its False Designation of Origin Claim ....19

        III.  Plaintiff Is Likely to Succeed on its Illinois Uniform Deceptive Trade Practice Act (UDTPA) Claim ...............................................................20

    III.  There Is No Adequate Remedy at Law and Plaintiff Is Likely to Suffer Irreparable Harm in the Absence of The Injunctive Relief......................................................21

    IV.  The Balancing of Harms Tips in Plaintiff's Favor..................................................22

    V.  Issuance of the Injunction is in the Public Interest................................................23

IV.  THE EQUITABLE RELIEF SOUGHT IS APPROPRIATE ................................24

    I.  A Temporary Restraining Order Immediately Enjoining Defendants' Unauthorized and Illegal Use of Plaintiff's Trade Dress Is Appropriate .......................................24

II.    An Order Preventing the Fraudulent Transfer of Assets Is Appropriate ...............25

III.   Plaintiff Is Entitled to Expedited Discovery ..........................................................26

IV.   Service of Process by Electronic Means Is Warranted in this Case ....................27

V.   A BOND SHOULD SECURE THE INJUNCTIVE RELIEF ........................................30

VI.  CONCLUSION ...........................................................................................................31

## **TABLE OF AUTHORITIES**

**Federal Cases**

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992) .............................................9

*Am. Broad. Co. v. Maljack Prods., Inc.*, 34 F. Supp. 2d 665 (N.D. Ill. 1998) ..........................20

*AM Gen. Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 805, 831-32 (7th Cir. 2002) ............21

*Arlington Specialties, Inc. v. Urban Aid,* Inc., 847 F.3d 415 (7th Cir. 2017) ....................10, 13

*Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145 (7th Cir. 1994) ................13, 16, 17, 18, 20

*Banister v. Firestone*, No. 17 C 8940, 2018 WL 4224444 (N.D. Ill. Sept. 5, 2018) ............... 26

*Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486 (7th Cir. 2019) ...............10, 13, 14

*Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992) ...................................23

*Christian Dior Couture, S.A. v. Lei Liu, et al.*, 2015 U.S. Dist. LEXIS 158225 (N.D. Ill. Nov. 17, 2015) ......................................................................................................................................9

*Columbia Pictures Indus., Inc. v. Jasso*, 927 F. Supp. 1075 (N.D. Ill. 1996) ......................8, 24

*CSC Holdings, Inc. v. Redisi*, 309 F.3d 988 (7th Cir. 2002) ....................................................25

*Deckers Outdoor Corp. v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, No. 13 C 07621, 2013 WL 12314399 (N.D. Ill. Oct. 31, 2013) ....................................................26, 30

*Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456 (7th Cir. 2000) ....................................23

*Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 947 (N.D. Ill. 2019) .....................25

*Gianni Versace, S.P.A. v. Yong Peng, et al.*, No. 18-cv-5385 (N.D. Ill. Feb. 27, 2019) .......28, 29

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) .........25

*Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325 (7th Cir. 1977) ...21

*Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018 (7th Cir. 1979) ...............................21

*In re Potash Antitrust Litig.,* 667 F. Supp. 2d 930 (N.D. Ill. 2009) ..........................................29

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc*, 846 F.2d 1079 (7th Cir.1988) ..........10, 21

*Incredible Techs., Inc. v. Virtual Techs*., Inc., 400 F.3d 1007 (7th Cir. 2005) ...........................10

*Krause Int'l Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994) ....................23

*KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005 (N.D. Ill. 2014) ........................17, 18

*Levi Strauss & Co., v. Zhejiang Weidu Garment Co., Ltd., et al.,* No. 16-cv- 7824 (N.D. Ill. Nov. 17, 2016) ........................................................................................................................29

*Logan Graphic Prod., Inc. v. Textus USA, Inc.*, No. 02 C 1823, 2003 WL 21011746 (N.D. Ill. May 5, 2003) ..............................................................................................................13, 15

*Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988 (N.D. Ill. 2001) .........................................9

*Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n*, 929 F. Supp. 473 (D.D.C. 1996) ................................................................................................................................23

*Nagravision SA v. Gotech Int'l Tech. Ltd*., 2018 U.S. App. LEXIS 2976 (5th Cir. 2018) ............29

*Neopost Industrie B.V. v. PFE International, Inc.,* 403 F. Supp. 2d 669 (N.D. Ill. 2005) ............20

*Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340 (1978) ............................................................26

*Packman v. Chicago Tribune Co.*, 267 F.3d 628 (7th Cir. 2001) ...................................................16

*Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) ........................21

*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159 (1995) ..........................................................11

*Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002) ....................................28, 29

*Scherr v. Volpe*, 466 F.2d 1027 (7th Cir. 1972) ............................................................................30

*Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722 (7th Cir. 2010) .......................13

*Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567 (N.D. Ill. 1994) ...............................................20

*Strabala v. Zhang*, 318 F.R.D. 81 (N.D. Ill. 2016) ................................................................ 29, 30

*Thomas & Betts Corp. v. Panduit Corp*., 138 F.3d 277 (7th Cir. 1998) .....................................11

*Top Tobacco v. Fantasia Distribution Inc.*, 101 F. Supp. 3d 783 (N.D. Ill. 2015) .......................16

*TraFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23 (2001) ..................................13

*Uncommon, LLC v. Spigen, Inc.,* 926 F.3d 409 (7th Cir. 2019) .....................................11

*USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427 (N.D. Ill. 2019) ........................................................................................................9

*Vance v. Rumsfeld*, No. 1:06-cv-06964, 2007 WL 4557812 (N.D. Ill. Dec. 21, 2007) ...............26

*Weber-Stephen Prods. LLC v. Sears Holding Corp.*, 2015 WL 5161347 (N.D. Ill. Sept. 1, 2015) ...................................................................................................................11

*Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202 (7th Cir. 1990) ....................20

**Federal Statutes**

11 U.S.C. § 1125 ...........................................................................................10, 16, 19

15 U.S.C. § 1051 ...............................................................................................8

15 U.S.C. § 1116 ...............................................................................................24

15 U.S.C. § 1117 ...............................................................................................25

28 U.S.C. § 1331 ...............................................................................................8

28 U.S.C. § 1338 ...............................................................................................8

28 U.S.C. § 1367(a) ...........................................................................................8

28 U.S.C. § 1391 ...............................................................................................8

**Federal Rules**

Fed. R. Civ. P. 4 ....................................................................................... 27, 28, 29

Fed. R. Civ. P. 26...................................................................................... 26

Fed. R. Civ. P. 65 .................................................................................... 8, 24, 30

**MEMORANDUM OF LAW**

Plaintiff Jiaxing Zichi Trade Co., Ltd, by and through undersigned counsel herein, hereby submits this Memorandum in support of its Ex Parte Motion for Entry of a Temporary Restraining Order, Asset Restraining Order, Expedited Discovery Order, and Service of Process by Electronic Means Order (the "Ex Parte Motion").

## I.    INTRODUCTION

Plaintiff brings this action against Defendants Ling Yang, d/b/a Emperor Goose, Cao Zi Qi, d/b/a FADSHOW, and Shanshan Ma, d/b/a Raddzo, and Does 1-50 (collectively "Defendants") for claims including federal trade dress infringement (Count I), false designation of origin (Count II), and violations of the Illinois UDTPA (Count III).  As alleged in the Complaint, Defendants have blatantly misappropriated Plaintiff's protectable trade dress in connection with their sale and/or offering for sale of low-quality competing products on Amazon.com under fictitious sellers' name.  Plaintiff is forced to file this action to combat Defendants' continued infringement of its trade dress by selling and/or offering for sale these low-quality knockoffs as well as to protect unknowing consumers from purchasing illegitimate low-quality products over the Internet.

The infringing product in question is the iconic and recent hit-product, the Orolay® Women's Thickened Down Jacket (hereinafter "the Orolay® jacket").  Plaintiff is a China-based company that owns the Orolay® brand and engages in the business of producing, manufacturing, and distributing high-quality and stylish down jackets.  Established in 2012, Plaintiff introduced its new Orolay® jacket to the U.S. marketplace in 2013.  The Orolay® jacket is distinctive and instantly recognizable, featuring voluminous paneling, multiple zippers (including side zippers that can be unfastened for a more stylish and relaxed fit), oversized pockets and a cocoon-like shape that is shorter in the front and longer in the back.

1

Plaintiff has spent an enormous amount of time, resources, and efforts in designing, creating, marketing and selling the Orolay® jacket, subject to rigorous quality control standards.



Thanks to these efforts, the Orolay® jacket has enjoyed massive success including invaluable consumer goodwill as well as wide publicity -- it has been spotted on celebrities, social media influencers and many others.

Unfortunately, Defendants have misappropriated the goodwill that Plaintiff has built throughout the years by selling poor quality winter jackets that intentionally and unmistakably copy Plaintiff's products without permission. As a consequence of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer from lost sales and diminished reputation and brand confidence in the marketplace, as consumers are confused into believing that Defendants' illegitimate products originates from or is otherwise associated with Plaintiff's products. Furthermore, the more the public is exposed to Defendants' illegitimate products, the less resonant and valuable will be Plaintiff's design of the Orolay® jacket and trade dress in functioning as indicia of product source as coming from Orolay®.

Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores through which Illinois residents can purchase knockoffs. Upon information and belief, Defendants are part of an illegal network of manufacturers and sellers involved in the manufacturing and sales of infringing versions of Plaintiff's products. Defendants intentionally conceal their true identities and the full scope of their illegal operations by operating under various sellers' aliases. Furthermore, Plaintiff is informed and on that basis believes that Defendants are highly likely to move funds from their U.S. financial accounts to unknown and offshore bank accounts outside the jurisdiction of this Court, and thereafter ignore the lawsuit and deny Plaintiff all means of redress without judicial intervention.

Given the apparent nature of intentional infringement, the clear resulting harm to Plaintiff's hard-earned good will and confusion to the public, and the fact that Defendants have gone to great lengths to avoid liabilities and enforcement efforts, Plaintiff respectfully request this court to issue *ex parte*: (1) a temporary restraining order against Defendants enjoining the manufacture, importation, distribution, offer for sale and sale of knockoffs; (2) an order temporarily restricting transfer of Defendants' assets to preserve Plaintiff's rights to an equitable accounting; (3) an order for expedited discovery allowing Plaintiff to inspect and copy Defendants' records relating to the manufacture, distribution, offer for sale and sale of infringing products and Defendants' financial accounts; and (4) an order allowing service by electronic means.

## II.    FACTUAL BACKGROUND

### A.    Orolay® Jacket a.k.a. the "Amazon Coat"

Plaintiff is a company duly organized under the laws of People's Republic of China. (Declaration of Jiawei Qiu ("Decl. Qiu") ¶ 3.) Plaintiff specializes in designing, developing and marketing high-quality and stylish down jackets. (*Id.* ¶ 4.) In 2013, Plaintiff debuted its new

Orolay® down jacket in the U.S., which is now sold throughout the U.S. through Plaintiff's Amazon store and on its own Website. (*Id.*) The Orolay® jacket is a high-quality down jacket with unique and distinctive designs, featuring voluminous paneling, multiple zippers (including side zippers that can be unfastened for a more stylish and relaxed fit), oversized pockets and a cocoon-like shape that is shorter in the front and longer in the back. (*Id.* ¶ 5.) The Orolay® trademark was federally registered in 2015 (U.S. Registration Numbers 4778909), and Plaintiff has since become the exclusive authorized distributor of the Orolay® product. (*Id.* ¶ 6.)

Media reports show that the Orolay® jacket began its rise to popularity in around 2018[1], earning its place in the fashion industry and becoming well-known among consumers of winter clothing. The popularity of the Orolay® jacket among the consuming public is undeniable as it has consistently remained a number one best-seller for women's coats on Amazon.com for six years in a row and has been featured in various newspapers (including Reuters, New York Times and Wall Street Journal), magazines, online articles and popular social media platforms. (*Id.* ¶ 19.) Popularly known as the "Amazon Coat", the Orolay® jacket has been reviewed over 17,000 times on Amazon. To this date, Plaintiff has sold over 415,000 units of Orolay® jackets, resulting in millions of dollars in revenue to Plaintiff. (*Id.*)

Plaintiff's success in the Orolay® jacket does not occur by accident. The Amazon reviews demonstrate and indicate that the unique and distinctive design of the Orolay® jacket has played a major role in the brand's success. For example, consumers have noted the following about the Orolay® jacket: "[the] cut is nice and unusual"; "[the] unique design looks really sharp", and "the

---

[1] Schneider, Katy. "The Unlikely Tale of a $140 Amazon Coat That's Taken Over the Upper East Side" New York Magazine, March 27, 2018. (https://nymag.com/strategist/amp/2018/03/the-orolay-amazon-coat-thats-overtaken-the-upper-east-side.html) (last accessed Jan. 27, 2021)

4

design is not like one I've seen before. It has a slight bell shape to it, which surprisingly is very flattering with every kind of outfit;" and "[the] main reason I bought this coat was this part of the description... 'The bottom of the eiderdown garment adopts unique crumples. This was coupled with fashion design and manifested a unique practicability of magnificence but at the same time not too overt.'" (*Id.* ¶ 21.)

The success of the Orolay® jacket also stems from the enormous amount of time, money, and effort that Plaintiff has expended to extensively and continuously promote and utilize the Orolay® brand in conjunction with the designs for the Orolay® jacket in the United States and in Illinois since the product's launch. In 2020 alone, Plaintiff spent over $150,000 in the promotion and advertising the Orolay® jacket, resulting in over 74,000,000 advertising placements to consumers and a robust social media presence dedicated to the Orolay® jacket. (*Id.* ¶ 16.) The distinctive look and feel of the Orolay® jacket, in conjunction with Plaintiff's diligent advertising and marketing efforts in promoting and building its recognition in the marketplace, have facilitated the product's undeniable popularity and the resonance of the design with the consuming public at large and generated enormous goodwill in the Orolay® brand and designs in the United States.

## B.    Defendants' Illegal Activities

Plaintiff's products have become so popular among, sought after by, and recognizable as a brand by the public that competitors like defendants started selling unauthorized merchandise that almost exactly copy the Orolay® jacket on Amazon.com. (*Id.* ¶ 23-24.) The similarities between Defendants' products and Plaintiff's Products are striking, as these products appear to be nearly identical. Exemplary images of an authentic and original Orolay® jacket compared with knock-off, counterfeited versions of the jacket can be seen as follows:

| Illustration 1: Exemplary Images of a Legitimate Orolay® Jacket |
|---|



| Illustration 2: Exemplary Images of FADSHOW/Raddzo's Infringing Product [2] | Illustration 3: Exemplary Images of Emperor Goose's Infringing Product [3] |
|---|---|



---

[2] FADSHOW Women's Winter Thickened Down Jackets Long Down Coats Warm Parka with Hood. FADSHOW Amazon Store. (last visited Jan. 24, 2021) (https://www.amazon.com/dp/B077N28CTS)

[3] Emperor Goose Women's Down Jacket Hooded Colorblock Puffer Parka Winter Down Coat. Emperor Goose Amazon Store (last visited Jan 24, 2021) (https://www.amazon.com/Emperor-Goose-Womens-Jacket-Thickened/dp/B07YC8B56V)

As can be readily seen from the comparison, Defendants' products have precisely the same design elements as the Orolay® jacket. Specifically, Defendants' products have the same cocoon-shape which is shorter in the front and longer in the back, the same placement and style of the panels, the oversized pockets and zippers including the side zippers that can be unfastened, among other shared features. (*Id*.) These overlaps are remarkable and unmistaken given the limitless options available to design and manufacture a winter jacket.

Furthermore, even though Defendants' products are intended to look and feel like Plaintiff's products, the quality of Defendants' down coats is vastly inferior. Amazon reviewers of Defendants' products have complained about the lack of quality control with respect to Defendants' products, including the inferior quality of zippers which got stuck all the time, the button popping off after one wear, and the seams being easily ripped apart. (*Id.* ¶ 26.)

Because Defendants' products are counterfeited versions that closely imitate the distinctive designs of the Orolay® jacket, their actions create a possibility that Plaintiff's trade dress will no longer serve as a unique identifier of Plaintiff's products to consumers and therefore dilutes the brand. Even worse, the inferior quality of Defendants' products could tarnish the reputation and goodwill that Plaintiff has worked very hard to develop, and on which Plaintiff has spent hundreds of thousands of dollars in promotions and advertising. As a result, Plaintiff has suffered and will continue to suffer lost sales and foregone business because of the improper and negative associations between Plaintiff's brand and the inferior knockoffs. In fact, Plaintiff's sales of the Orolay® jacket in 2020 was 40% of those in 2019, despite an increase of budget in advertising and promotion, due to the significant counterfeiting activity on the Internet. (*Id.* ¶ 29.)

/ / /

/ / /

## III.   **ARGUMENT**

Rule 65(b) of the Federal Rules of Civil Procedure provides that the Court may issue an *ex parte* TRO where immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition.  Fed. R. Civ. P. 65(b).  The entry of a TRO is appropriate in this case because it would immediately stop the Defendants from benefiting from their wrongful use of Plaintiff's trade dress, to prevent consumers from further confusion, and to preserve the status quo until a hearing can be held.

In the absence of a TRO without notice, the Defendants can and likely will register new e-commerce stores under new aliases to continue their sales of infringing products and move any assets to off-shore bank accounts outside the jurisdiction of this Court. (Declaration of Edward Chen ("Chen Decl") ¶ 3.)  Courts have recognized that civil actions against counterfeiters present special challenges that justify proceeding on an *ex parte* basis. See *Columbia Pictures Indus., Inc. v. Jasso*, 927 F. Supp. 1075, 1077 (N.D. Ill. 1996) (observing that "proceedings against those who deliberately traffic in infringing merchandise are often useless if notice is given to the infringers".)  As such, Plaintiff respectfully requests that this Court issue the requested *ex parte* TRO.

This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. §§ 1338(a)-(b), and 28 U.S.C. § 1331.  This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.  Venue is proper pursuant to 28 U.S.C. § 1391.

This Court may properly exercise personal jurisdiction over Defendants since Defendants directly target business activities toward consumers in the United States, including Illinois, through

operating or assisting in the operations and selling of infringing products through fully interactive online stores located on Amazon Marketplace.  (Chen Decl. ¶ 2, Exhibit A, B and C.); *See, e.g., Christian Dior Couture, S.A. v. Lei Liu, et al.*, 2015 U.S. Dist. LEXIS 158225, at *6 (N.D. Ill. Nov. 17, 2015) (personal jurisdiction proper over defendant offering to sell alleged infringing product to United States residents, including Illinois; no actual sale required).  Defendants are directly involved in the commission of tortious acts in Illinois, are engaging in interstate commerce, and have wrongfully caused Plaintiff substantial injury in the State of Illinois.  (*Id.*)

### A.  Standard for Temporary Restraining Order and Preliminary Injunction

District Courts within this Circuit hold that the standard for granting a TRO and the standard for granting a preliminary injunction are identical.  *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) (citing *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001)).  A party seeking to obtain a preliminary injunction must demonstrate: (1) that its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that it will suffer irreparable harm if the injunction is not granted.  *See Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

If the Court is satisfied that these three conditions have been met, then it must consider the harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.  *Id.*  Finally, the Court must consider the potential effect on the public interest (non-parties) in denying or granting the injunction.  *Id.*  The Court then weighs all of these factors, "sitting as would a chancellor in equity," when it decides whether to grant the injunction.  *Id.*  (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)).  This process involves engaging in what the Court has deemed

"the sliding scale approach" – the more likely the plaintiff will succeed on the merits, the less the balance of harms need favor the plaintiff's position. *Id.*

### B. Likelihood of Success on the Merits

#### i. <u>Plaintiff Is Likely to Succeed on Its Trade Dress Infringement Claims</u>

Plaintiff only needs to show that it has "some likelihood" of success on the merits. *Ty, Inc.* 237 F.3d at 896 (7th Cir. 2001) ("Initially, the court only needs to determine that the plaintiff has some likelihood of success on the merits.")  This requires only a "better than negligible" chance of succeeding on the merits. *Id*. (quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988)).

The Lanham Act permits a civil action against any person who uses "any word, term, name, symbol, or device" "in connection with any goods or services" in a manner which "is likely to cause confusion" as to the source of those goods or services.  15 U.S.C. § 1125(a)(1)(A).  The Act's protection extends to a product's trade dress, which includes a product design that is so distinctive that it identifies the product's source.  *Arlington Specialties, Inc. v. Urban Aid, Inc*., 847 F.3d 415, 418 (7th Cir. 2017); *see also TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001) ("The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning … is a trade dress[.]")  To prevail on a trade dress infringement claim, Plaintiff must establish that (1) the claimed trade dress has acquired secondary meaning, (2) the claimed trade dress is non-functional, and (3) a likelihood of confusion exists between the trade dress of the plaintiff and that of the defendant. "  *Incredible Techs., Inc. v. Virtual Techs*., Inc., 400 F.3d 1007, 1015 (7th Cir. 2005); *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 491

(7th Cir. 2019). As explained below, Plaintiff meets this test and is more than likely to prevail on the merits.

1.  *Plaintiff's trade dress is valid because it has developed a secondary meaning.*

A trade dress acquires secondary meaning when, "in the minds of the public, the primary significance of a product feature ... is to identify the source of the product rather than the product itself." *Thomas & Betts Corp. v. Panduit Corp*., 138 F.3d 277, 291 (7th Cir. 1998) (alteration in original) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995)). A plaintiff can establish secondary meaning "through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Thomas & Betts*, 138 F.3d at 291 (internal quotation marks omitted); *see also Uncommon, LLC v. Spigen, Inc.,* 926 F.3d 409, 424 (7th Cir. 2019) (similar).

**Amount and Manner of Advertising.** "Advertising which encourages consumers to identify the claimed trade dress with the particular producer is some evidence of secondary meaning." *Thomas & Betts*, 138 F.3d at 292. An explicit direction to draw consumer attention of the trade dress was unnecessary. *Id.* The advertising which prominently features the trade dress could also function to draw consumers' attention to the connection between the trade dress and the trade dress owner. *Id.; see also Weber-Stephen Prods. LLC v. Sears Holding Corp.*, 2015 WL 5161347, at *2 (N.D. Ill. Sept. 1, 2015) ("Advertising ... put the trade dress and the [brand] name together in front of the public. This gave rise to the possibility that consumers would draw a connection between the trade dress and brand.") (citation omitted). In this regard, Plaintiff has spent handsomely advertising and promoting the Orolay® jacket since its 2013 launch, including prominently displaying Orolay® jacket in conjunction with the Orolay® brand. (Qiu Decl. ¶ 17.)

11

**Illustration 4: Examples of Plaintiff's Advertisements on the Orolay® jacket**



*Volume of Sales and Place in the Market.* Plaintiff has sold approximately 415,000 units of Orolay® jackets since the product launch in 2013. (*Id.* ¶ 19.) The Orolay® jacket has remained the No.1 best-seller on Amazon for six years in a row. (*Id.*) Furthermore, due to the immense popularity of the product, Plaintiff received the most Innovative Amazon Seller Award in 2019. (*Id.*) Popularly known as the "Amazon Coat", the Orolay® jacket has been reviewed over 17,000 times on Amazon. (*Id.*) The Orolay® jacket has also been the subject of repetitive and extensive media coverage which includes Reuters, New York Times, CNBC and Wall Street Journal. (*Id.*)

*Length and Manner of Use.* The Orolay® jacket has consistently and continuously been sold in the marketplace since 2013, and they have always included the same features which embody the product's trade dress. (*Id.* ¶ 5.) It is those features and the consistency of their use that distinguishes the Orolay® jackets from competitor's products.

*Evidence of Intentional Copying.* As set forth above, that Defendants deliberately copied Plaintiff's trade dress is beyond question. Defendants transparently and self-consciously copied

---

[4] https://www.instagram.com/p/CGfI4hag5Li/

12

that trade dress in its effort to fully duplicate the look and feel of Plaintiff's trade dress – down to almost every detail -- and to convert the goodwill Plaintiff has generated in its Orolay® jacket. This supplements the myriad evidence already assembled concerning secondary meaning and serves to confirm what that evidence makes obvious – Plaintiff possesses valid and protectable trade dress.

2. *Plaintiff's trade dress is non-functional.*

To be protectable, trade dress, *as a whole*, cannot be solely functional. *See Bodum*, 927 F.3d at 491. Functionality must be analyzed by reference to the overall combination and arrangement of the various features – not on the functionality of each of the individual features. *Badger Meter, Inc. v. Grinnell Corp*., 13 F.3d 1145, 1154; *Logan Graphic Prod., Inc. v. Textus USA, Inc.*, No. 02 C 1823, 2003 WL 21011746, at *4 (N.D. Ill. May 5, 2003). "A product feature is functional ... 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.' Even if a product feature does not satisfy that definition, it can still be functional if it is a 'competitive necessity,' that is, if its exclusive use 'would put competitors at a significant non-reputation-related disadvantage.'" *Id.* at 419 (citation omitted) (quoting *TraFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 32-33 (2001)); *see also Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722, 727 (7th Cir. 2010) (explaining that a trade dress is functional when the product "looks the way it does in order to be a better [product], not in order to be a better way of identifying who made it.") "The question [in assessing functionality] is not ... whether the claimed trade dress has less utility than alternatives, ... [but] whether the design feature affects the product quality or cost or is merely ornamental." *Arlington Specialties*, 847 F.3d at 420 (internal quotation marks omitted).

Several factors bear on whether a trade dress element is functional, including: "(1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; [and] (5) the effect of the design feature on an item's quality or cost." *Bodum*, 927 F.3d at 492 (quoting *Ga.-Pac.*, 647 F.3d at 727-28). No single factor is dispositive, and courts consider each factor separately. *Id.*

**Plaintiff's trade dress does not have any design elements that have been subject to a utility patent**. The first factor clearly weighs in favor of non-functionality. Plaintiff has never filed for a utility patent for the Orolay jacket® as a whole, or for any element thereof. (Qiu Decl. ¶ 13.)

**Plaintiff's trade dress provides no utilitarian advantage over alternatives.** Plaintiff made deliberate design choice in creating the Orolay® jacket, which is intended to distinguish the Orolay® jacket from other winter clothing and to signify to the consumers that the product comes from Orolay®. (*Id.* ¶ 7.) The specific features comprising Plaintiff's trade dress does not provide a utilitarian advantage over alternative designs. There are numerous ways to design a down jacket that will function equally well, e.g., keeping one warm in cold days while allowing easy movement and containing pockets that allow one to carry small items on the go. (*Id.* ¶ 11.) As such, the features of the Orolay® jacket are "merely ornamental" and "not necessary to make the product work better." *Bodum*, 927 F.3d at 493 ("Whether it is more advantageous for a French press to have a handle, however, is not the pertinent inquiry; the question is whether there is an advantage to having this designed handle ...").

14

***Plaintiff's advertising does not tout the utilitarian advantages other than features common to most down jackets.*** Plaintiff has never advertised any utilitarian advantages of its Orolay® jacket, other than those features that holds true for most down jackets, e.g., warmth, easy movements and pockets to store small items. (Qiu Decl. ¶ 12.)

***A myriad of alternative designs exists to create a down jacket.*** The existence of competing product designs indicates that the trade dress is non-functional. *See Logan*, 2003 WL 21011746, at *4 ("[I]t is appropriate at [the preliminary injunction] stage to consider the existence of alternative designs in the marketplace when determining whether product features are functional.") Here, alternate and non-infringing designs[5] are not just available but are in wide use in the marketplace. (Qiu Decl. ¶ 14.) Plaintiff itself sells numerous lines of down jackets that are different from the Orolay® jacket. (*Id.* ¶ 11.) As such, Defendants could use alternative designs without any disadvantage – other than the disadvantage of not riding on Plaintiff's goodwill.

***The features of the Orolay® jacket does not affect quality or costs.*** Plaintiff did not select the features of the Orolay® jacket for purposes of increasing quality or reducing costs. (*Id.* ¶ 9-10.) Plaintiff could have chosen alternative simplified designs that are less expensive to produce, and Plaintiff actually manufactures and sell down jackets with simpler designs at lower costs. (*Id.*) Furthermore, although the Orolay® jacket is made with high-quality materials, the particular design was not chosen to improve quality. (*Id.* ¶ 10.) Defendants, for its part, could have selected any number of alternatives designs that would have worked equally well from a cost of goods and ease of manufacture standpoint but would not have provided the overall look and appearance that Plaintiff sought for its Orolay® jacket.

---

[5] While there may be other products that possess some of the elements of the Plaintiff's trade dress, they critically differ in major aspects and thus avoid infringement.

**Illustration 5: Exemplary Image of a Simplified Design of the Orolay® Jacket**



### 3. *Consumers are likely to be confused.*

A defendant's product infringes the plaintiff's trade dress if the plaintiff shows that similarity of the defendant's trade dress to that of the plaintiff's creates a likelihood of confusion on the part of consumers as to the source of the goods. 15 U.S.C. § 1125; *Badger*, 13 F.3d at 1151; *Top Tobacco v. Fantasia Distribution Inc.*, 101 F. Supp. 3d 783, 788 (N.D. Ill. 2015). Courts in the Seventh Circuit consider seven factors when analyzing the likelihood of confusion: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another. *Top Tobacco*, 101 F. Supp. 3d at 789 (citing *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001)). "[T]hough no one factor is decisive, the similarity

of the marks, the intent of the defendant, and evidence of actual confusion are the most important factors ..." *Ty, Inc,*237 F.3d at 898 (internal quotation marks omitted).

**Plaintiff's trade dress and Defendants' products are strikingly similar.**  The first factor clearly weighs in favor of a likelihood of confusion if the Plaintiff's and the Defendant's products outwardly are similar in appearance.  *See Badger*, 13 F.3d at 1152.  As discussed above, the visual similarities between the infringing products and the Orolay® jacket are beyond question. As can be readily seen from an inspection of the infringing products, these products contain all of the design elements of the Orolay® jacket, including the same cocoon-shape which is shorter in the front and longer in the back, the same placement and style of the panels, the oversized pockets and zippers including the side zippers that can be unfastened, among other shared features.

**Plaintiff's products and the infringing products are similar types of goods.**  A Plaintiff's and Defendant's products are considered similar in type if the buying public would reasonably think they come from the same source, or are affiliated with, connected to, or sponsored by, the same source.  *Ty*, 237 F.3d at 900; *Top Tobacco*, 101 F. Supp. 3d at 790; *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1015 (N.D. Ill. 2014).  This factor is further supported if the plaintiff and defendant are in the same industry.  *Top Tobacco*, 101 F. Supp. at 790.  Here, the infringing products and the Orolay® jacket comprise the same types of goods.  And the Orolay® jacket and the infringing products are almost exactly the same and marketed to the same consumers looking for winter clothing on Amazon.com.  Moreover, Defendants and Plaintiff are apparently in the same industry.  As such, the buying public is likely to think Orolay® and the infringing products are associated or originate from a common source.

**Plaintiff's products and Defendants' products are sold in the same area.**  For the third factor, courts consider the products' geographical areas of distribution; whether the products

17

directly compete with each other; whether products are sold to consumers in the same type of store; and whether the products are sold through the same marketing channels. *Top Tobacco*, 101 F. Supp. 3d at 790 – 91. The area and manner of concurrent use favors a finding of likelihood of confusion if the products directly compete for customers. *See Badger*, 13 F.3d at 1152. Here, Plaintiff and Defendants target similar buyers and are directly competing with one another on the Amazon marketplace. *See Ty*, 237 F.3d at 900 – 01 (internal quotation marks omitted). As such, this factor, too, weighs in favor of a finding of "likelihood of confusion."

*Consumers are not likely to exercise a high degree of care and discrimination in their purchase.* Here, Defendants sell products that are almost exactly the same as the Orolay® jacket. Consumers searching for Orolay® jacket are therefore less likely to exercise a high degree of care in their purchase when the products are generally indistinguishable from one another. This factor thus increases the likelihood of consumer confusion.

*Plaintiff's trade dress is strong.* To determine the strength of the plaintiff's trade dress, courts "examine the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Top Tobacco*, 101 F. Supp. 3d at 791. Relevant evidence includes the amount of advertising and the volume of sales. *See id.*; *KJ Korea,* 66 F. Supp. 3d at 1016. Here, Plaintiff's trade dress is strong for all the reasons described above. Indeed, the evidence assembled and recited in demonstrating that these goods have attained secondary meaning establishes, by corollary, the obvious strength of the trade dress and its resonance with the consuming public. *See supra.*

*Actual confusion has already occurred.* Indeed, instances of actual confusion among consumers have already occurred based on the near identicality between the infringing products and Plaintiff's authentic Orolay® jacket. For example, one Amazon reviewer mistakenly believed

that Defendants' products were the legitimate Orolay® jacket: "I have been eyeing the Amazon coat for a while and wanted to get one – so I ordered this." (Qiu Decl. ¶ 25, Exhibit B). As another example, one reviewer commented that she was confused by the label of the coat, which was not Orolay®, and that she wasn't sure if the seller has any connection with Orolay®. (*Id*., Exhibit C). These comments clearly demonstrate that Defendants' products have already caused actual confusion and will likely cause additional confusion among consumers because of Defendants' current and continuous use of Plaintiff's trade dress.

***Defendants intended to palm off its products as Orolay® jacket.*** As set forth above, the overlaps between Defendants' products and the Orolay® jacket is remarkable and unmistaken given the limitless options available to design and manufacture a winter jacket, and yet, at every step of the way, Defendants consciously choose to mirror the look and feel of the Orolay® jacket. Hence, the inescapable conclusion is that Defendants knowingly and intentionally sought out to copy the Orolay® jacket to deceive and mislead the public into believing that their products are sponsored, licensed, authorized by, affiliated, connected, or otherwise associated with Orolay®. Therefore, the final factor regarding Defendants' intent also weighs heavily in Plaintiff's favor.

For the reasons set forth above, and in particular the similarities of the product design, the clear intent of the Defendants to piggyback off Plaintiff's good will, and evidence of actual consumer confusion, Plaintiff has proved it has a reasonable likelihood of success on the merits for its trade dress infringement claim.

### ii. <u>Plaintiff Is Likely to Succeed on Its False Designation of Origin Claim.</u>

A plaintiff bringing a false designation of origin claim under 15 U.S.C. § 1125(a) must show that: (1) defendant used a false designation of origin in connection with products; (2) defendant's use of the products was in interstate commerce; and (3) there is a likelihood that

consumers will be confused by defendant's false designation of origin. *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204 (7th Cir. 1990). The test to be used in determining whether a violation has occurred is whether "the evidence indicates a likelihood of confusion, deception or mistake on the part of the consuming public." *Id.* at 1205. This is the same test that is used for determining whether trademark infringement has occurred under the Lanham Act. *See Neopost Industrie B.V. v. PFE International, Inc., 403 F. Supp. 2d 669, 684 (N.D. Ill. 2005)*; *see also Badger,* 13 F.3d at 1152 (applying the same factors in a trade dress case). Because Plaintiff has established a likelihood of success on the merits of its trade dress infringement claim against Defendants (*supra*), a likelihood of success on the merits for Plaintiff's false designation of origin claim is also established.

### iii.  Plaintiff Is Likely to Succeed on its Illinois UDTPA Claim.

In Illinois, courts resolve unfair competition and deceptive trade practice claims "according to the principles set forth in the Lanham Act." *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994). Illinois courts look to federal case law and apply the same analysis to state infringement claims. *Id.* at 579 (citation omitted). The determination as to whether there is a likelihood of confusion is similar under both the Lanham Act and the Illinois Uniform Deceptive Trade Practice Act. *Am. Broad. Co. v. Maljack Prods., Inc.*, 34 F. Supp. 2d 665, 681 (N.D. Ill. 1998). Because Plaintiff has established a likelihood of success on the merits of likelihood of confusion in its trade dress infringement claim against Defendants (*supra*), and the standard is the same under Illinois law, Plaintiff has established a likelihood of success on the merits for its Illinois Uniform Deceptive Trade Practices Act claim.

### C. There Is No Adequate Remedy at Law and Plaintiff Is Likely to Suffer Irreparable Harm in the Absence of The Injunctive Relief.

The Seventh Circuit has applied a presumption of irreparable harm in trade dress suits. *See AM Gen. Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 805, 831-32 (7th Cir. 2002) (recognizing, in a trade dress case, "the law's presumption that trademark dilution or infringement threatens irreparable injury for which there is no adequate remedy at law"). Irreparable injury "almost inevitably follows" when there is a high probability of confusion because such injury "may not be fully compensable in damages." *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1332 (7th Cir. 1977) (citation omitted). "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods.' *Int'l Kennel Club of Chicago,* 846 F.2d at 1092. As such, monetary damages are likely to be inadequate compensation for such harm. *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979); *see also Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) (finding that damage to plaintiff's goodwill was irreparable harm for which plaintiff had no adequate remedy at law).

If a TRO is not granted, Plaintiff will suffer loss for which there is no adequate remedy at law because: (1) Defendants' infringement connects the infringing products to a genuine Orolay® jacket by causing consumer confusion regarding source and affiliation; (2) Plaintiff has no control over the manufacturing or quality control of the infringing product – therefore, any quality problems related to Defendants' products would be attributed to Plaintiff, resulting in damaged goodwill and undetectable lost sales; and (3) the ongoing sale or offering for sale of the infringing products by Plaintiff decreases the distinctiveness of the Plaintiff's trade dress.

As detailed above, Plaintiff has made substantial investment in – and succeeded in – establishing its significant reputation and goodwill in its Orolay® jacket. In the absence of an

injunction, Plaintiff will lose the value of that investment. The net result will be damage to Plaintiff in the form of lost profits and business opportunities, which amount cannot be measured or compensated by monetary damages alone. Furthermore, unabated infringement will encourage others to use Plaintiff's intellectual property without Plaintiff's permission.

In addition, Defendants have hijacked that reputation to sell competing products over which Plaintiff has no control. Trademarks identify their owners and in them resides the reputation and goodwill of their owners. Thus, if Defendants are permitted to infringe upon the Plaintiff's trade dress, Defendants are borrowing Plaintiff's reputation for its own goods, whose quality no longer lies within Plaintiff's control. A trademark owner's loss of the ability to control its mark, thus, creates a high likelihood for damage to its reputation. Plaintiff employs rigorous quality controls over its products (Qiu Decl. ¶ 22.), and yet Plaintiff has no control over the quality of Defendant's directly competitive infringing products. As close as Defendants' infringing are to Plaintiff authentic designs, Plaintiff would never release products with that inferior quality.

    **D.**  <u>**The Balancing of Harms Tips in Plaintiff's Favor**</u>

As noted above, if the Court is satisfied that Plaintiff has demonstrated (1) a likelihood of success on the merits, (2) no adequate remedy at law, and (3) the threat of irreparable harm if preliminary relief is not granted, then it must next consider the harm that Defendants will suffer if temporary relief is granted, balancing such harm against the irreparable harm Plaintiff will suffer if relief is denied. *Ty, Inc.*, 237 F.3d at 895. The potential harm to Defendants is insignificant as they will simply be prevented from willfully infringing Plaintiff's trade dress and from trading on Plaintiff's good will – actions that Defendants are never authorized to do in the first place. *See Ty*, 237 F.3d at 903 (when assessing the harm to the alleged infringer, "the court excludes the burden it voluntarily assumed by proceeding in the face of known risk.")

Furthermore, as willful infringers, Defendants are entitled to little equitable consideration. "When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994). This is because "[o]ne who adopts the mark of another for similar goods acts at his own peril since he has no claim to the profits or advantages thereby derived." *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992) (internal quotation marks omitted); *see also Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (recognizing that in weighing balancing of harms, "the court excludes the burden [the defendants] voluntarily assumed by proceeding in the face of a known risk"). Therefore, the balance of harms "cannot favor a defendant whose injury results from the knowing infringement of the plaintiff's trademark." *Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n*, 929 F. Supp. 473, 478 (D.D.C. 1996).

As Plaintiff has demonstrated, Defendants have been profiting from the sale of knock-off products. Thus, the balance of equities tips decisively in Plaintiff's favor. As such, equity requires that Defendants be ordered to cease their unlawful conduct.

### E. Issuance of the Injunction is in the Public Interest.

An injunction in these circumstances is in the public interest because it will prevent consumer confusion and stop defendants from violating federal trademark law. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000) ("[T]he public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion.") Indeed, the gravamen of trademark protection is the right of the public to be free of confusion, along with the right of the trademark owner to control its reputation and its products' reputation; therefore,

preventing Defendants from infringing Plaintiff's trade dress and other of Plaintiff's rights promotes the interests of the public.

## IV.    THE EQUITABLE RELIEF SOUGHT IS APPROPRIATE.

The Lanham Act authorizes courts to issue injunctive relief "according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark… or to prevent a violation of [any right of the trade dress]."  15 U.S.C. § 1116(a).

### A.  A Temporary Restraining Order Immediately Enjoining Defendants' Unauthorized and Illegal Use of Plaintiff's Trade Dress Is Appropriate.

Rule 65(b) of the Federal Rules of Civil Procedure provides that a court may issue a temporary restraining order without notice where facts show that the movant will suffer immediate and irreparable injury, loss, or damage before the adverse party can be heard in opposition.  For the reasons set forth above, this case warrants such relief.

Plaintiff requests *ex parte* a temporary injunction requiring the Defendants to immediately cease all use of Plaintiff's trade dress, or similar variations thereof, on or in connection with the Defendant internet store and any related store.  Such relief is necessary to stop the ongoing harm to Plaintiff's trade dress and associated goodwill, as well as harm to consumers, and to prevent the Defendants from continuing to benefit from their unauthorized use of the Plaintiff's trade dress. The need for *ex parte* relief is magnified in today's global economy where counterfeiters can operate anonymously over the Internet, and this Court has recognized that civil actions against counterfeiters present special challenges that justify proceeding on an *ex parte* basis. *See Columbia Pictures Indus., Inc.*, 927 F. Supp. at 1077 (observing that "proceedings against those who deliberately traffic in infringing merchandise are often useless if notice is given to the infringers"). Plaintiff is currently unaware of the true identities and locations of the Defendants, as well as the

scope and volume of Defendants' counterfeiting operation, nor how many other Defendant internet stores are used to sell and distribute the infringing products. (Qiu Decl. ¶ 27.) Courts ordinarily authorize immediate injunctive relief in similar cases involving the unauthorized use of trademarks and counterfeiting. *See, e.g*., *Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 947 (N.D. Ill. 2019).

### B.  An Order Preventing the Fraudulent Transfer of Assets Is Appropriate.

Plaintiff also requests an *ex parte* restraint of Defendants' assets so that Plaintiff's right to an equitable accounting of Defendants' profits from sales of the infringing products is not impaired or entirely lost.  Issuing an *ex parte* restraint will ensure Defendants' compliance.  If such a restraint is not granted in this case, Defendants are highly likely to disregard their responsibilities and fraudulently transfer financial assets to overseas accounts before a restraint is ordered.  (Chen Decl. ¶ 3.)

Courts have the inherent authority to issue a prejudgment asset restraint when plaintiff's complaint seeks relief in equity.  *See Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 325 (1999) (holding that asset freeze pending outcome of case is proper where plaintiff seeks equitable relief); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) ("[S]ince the assets in question ... were the profits of the [defendants] made by unlawfully stealing [the plaintiff's] services, the freeze was appropriate and may remain in place pending final disposition of this case.")

In addition, Plaintiff has shown a strong likelihood of succeeding on the merits of their trade dress infringement claim, so according to the Lanham Act 15 U.S.C. § 1117(a)(1), Plaintiff is entitled, "subject to the principles of equity, to recover ... defendant's profits."  Plaintiff's Complaint seeks, among other relief, that Defendants account for and pay to Plaintiff all profits

realized by Defendants by reason of Defendants' unlawful acts. Therefore, this Court has the inherent equitable authority to grant Plaintiff's request for a prejudgment asset freeze to preserve relief sought by Plaintiff. *Banister v. Firestone*, No. 17 C 8940, 2018 WL 4224444, at *9 (N.D. Ill. Sept. 5, 2018) (citing *Deckers Outdoor Corp. v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, No. 13 C 07621, 2013 WL 12314399, at *2 (N.D. Ill. Oct. 31, 2013) (unpublished)).

Plaintiff has shown a strong likelihood of success on the merits, an immediate and irreparable harm suffered as a result of Defendants' activities and that, unless Defendants' assets are frozen, Defendants will likely hide or move their ill-gotten funds to other unidentifiable or offshore bank accounts. Accordingly, an asset restraint is proper.

### C. Plaintiff Is Entitled to Expedited Discovery.

The United States Supreme Court has held that "federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits." *Vance v. Rumsfeld*, No. 1:06-cv-06964, 2007 WL 4557812, at *6 (N.D. Ill. Dec. 21, 2007) (quoting *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351(1978)). Courts have wide latitude in determining whether to grant a party's request for discovery. *Id.* (citation omitted). Furthermore, courts have broad power over discovery and may permit discovery in order to aid in the identification of unknown defendants. *See* Fed. R. Civ. P. 26(b)(2).

Plaintiff respectfully requests expedited discovery to discover bank and payment system accounts Defendants use for their counterfeit sales operations. The expedited discovery requested in Plaintiff's proposed TRO is limited to include only what is essential to prevent further irreparable harm. Discovery of these financial accounts so that they can be frozen is necessary to ensure that these activities will be contained. *See, e.g., Deckers Outdoor Corporation v. The Partnerships, et al.,* No. 15-cv-3249 (N.D. Ill. April 4, 2015) (unpublished).

More importantly, Defendants have engaged in many deceptive practices in an effort to hide their identities and accounts. (Chen Decl. ¶ 3, 7.) Plaintiff's seizure and asset restraint may have little meaningful effect without the requested relief. Accordingly, Plaintiff respectfully requests that expedited discovery be granted.

### D. Service of Process by Electronic Means Is Warranted.

Pursuant to Federal Rule of Civil Procedure 4(f)(3), Plaintiff requests an order allowing services of process by electronically publishing a link to the Complaint, the Temporary Restraining Order, and other relevant documents on a website and by sending an e-mail to the e-mail addresses provided for the Defendants by third parties that includes a link to said website. Plaintiffs submit that providing notice via electronic publication and e-mail, along with any notice that Defendants receive from payment processors, is reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and afford them the opportunity to present their objections.

Electronic service is appropriate and necessary in this case because, on information and belief, the Defendants: (1) provide incomplete and/or false names and physical address information to conceal their locations and avoid liability for their unlawful conduct; and (2) rely primarily on electronic communications to communicate with their customers and third party service providers, demonstrating the reliability of this method of communication by which Defendants may be apprised of the pendency of this action. (Chen Decl. ¶ 7.) Authorizing service of process solely via e-mail and electronic publication will benefit all parties and the Court by ensuring that Defendants receive prompt notice of this action, thus allowing this action to move forward expeditiously. (*Id.*) Absent the ability to serve Defendants in this manner, Plaintiffs will almost certainly be left without the ability to pursue a final judgment.

27

While offshore Internet store operators do not generally provide accurate physical addresses, they must provide a valid e-mail address to customers for completing payment and/or managing their Internet stores. (*Id.*) Moreover, it is necessary for merchants, such as Defendants, who operate entirely online, to visit their Internet store to ensure it is functioning and to communicate with customers electronically. As such, it is far more likely that Defendants can be served electronically than through traditional service of process methods.

Federal Rule of Civil Procedure 4(f)(3) allows this Court to authorize service of process by any means not prohibited by international agreement as the Court directs. *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002). The Ninth Circuit in *Rio Properties* held, "without hesitation," that e-mail service of an online business defendant "was constitutionally acceptable." *Id.* at 1017. The Court reached this conclusion, in part, because the defendant conducted its business over the Internet, used e-mail regularly in its business, and encouraged parties to contact it via e-mail. *Id.*

Plaintiffs have good cause to suspect the Defendants are all residents of China. (Qiu Decl. ¶ 27.) The People's Republic of China is a signatory to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters (the "Hague Convention"). According to Article 1 of the Hague Convention, the "convention shall not apply where the address of the person to be served with the document is not known*." Id.* United States District Courts, including Courts in this District, routinely permit alternative service of process notwithstanding the applicability of the Hague Convention. *See e.g.*, *Gianni Versace, S.P.A. v. Yong Peng, et al*., No. 18-cv-5385 (N.D. Ill. Feb. 27, 2019) ("Nor must Versace attempt service by contacting the Chinese Ministry of Justice, as suggested by [defendant]. The plain language of Rule 4 requires only that service be made as directed by the court and not prohibited by

international agreement."); *In re Potash Antitrust Litig.,* 667 F. Supp. 2d 907, 930 (N.D. Ill. 2009) ("plaintiffs are not required to first attempt service through the Hague Convention."); *see also Strabala v. Zhang*, 318 F.R.D. 81, 114 (N.D. Ill. 2016) (authorizing alternative service pursuant to Fed. R. Civ. P. 4(f)(3); *Levi Strauss & Co., v. Zhejiang Weidu Garment Co., Ltd., et al.,* No. 16-cv- 7824 (N.D. Ill. Nov. 17, 2016) (same). The Hague Convention also does not preclude service by e-mail, and the declarations to the Hague Convention filed by China do not appear to prohibit e-mail service. (Chen Decl. ¶ 8-10.) In addition, the law of the People's Republic of China does not appear to prohibit electronic service of process. (*Id.* ¶ 11)

Furthermore, Rule 4 does not require that a party attempt service of process by other methods enumerated in Rule 4(f) before petitioning the court for alternative relief under Rule 4(f)(3). *Rio Props.* 284 F.3d at 1014-15 (9th Cir. 2002). As the *Rio Properties Court* explained, Rule 4(f) does not create a hierarchy of preferred methods of service of process. *Id.* at 1014. To the contrary, the plain language of the Rule requires only that service be directed by the court and not be prohibited by international agreement. There are no other limitations or requirements. *Id.* Alternative service under Rule 4(f)(3) is neither a "last resort" nor "extraordinary relief," but is rather one means among several by which an international defendant may be served. *Id.* Also, Courts have confirmed that the Hague Convention does not displace Rule 4(f)(3). *See Gianni Versace, S.P.A. v. Yong Peng, et al.*, No. 18-cv-5385 (N.D. Ill. Feb. 27, 2019) (citing *Nagravision SA v. Gotech Int'l Tech. Ltd*., 2018 U.S. App. LEXIS 2976 (5th Cir. 2018) ("Overlooking Rule 4(f)(3) entirely, Gotech argues that the service did not comply with the Hague Convention and Rule 4(f)(1)). This argument misses the mark because service was not effected pursuant to Hague Convention, and that agreement does not displace Rule 4(f)(3).") Finally, Court-directed electronic service pursuant to Rule 4(f)(3) is particularly appropriate in this case where "there is a

need for speed that cannot be met by following the Hague Convention methods..." because of the injunctive relief sought by Plaintiffs. *Strabala,* 318 F.R.D. at 114 (N.D. Ill. 2016). As such, this Court may allow Plaintiffs to serve the Defendants via electronic publication and e-mail.

For the reasons set forth herein, Plaintiff respectfully request this Court's permission to serve Defendants via e-mail and electronic publication.

## V.    A BOND SHOULD SECURE THE INJUNCTIVE RELIEF

The amount of the security bond under Federal Rule of Civil Procedure 65(c) is in the discretion of the Court. *See Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972). The Seventh Circuit has determined that a strong likelihood of success is a major factor which could weigh heavily in favor of waiving a bond requirement. *Id.* Because of the strong and unequivocal nature of Plaintiff evidence of trade dress infringement, Plaintiff asks this Court to require Plaintiff post a bond of no more than ten thousand U.S. dollars ($10,000.00). *See, e.g., Deckers Outdoor Corporation v. The Partnerships, et al.*, 2013 WL 1337616 (N.D. Ill. March 27, 2013) (unpublished) (setting $10,000 bond).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## VI.     CONCLUSION

Defendants' counterfeiting operations irreparably harms Plaintiff's business, the Orolay® brand and consumers. Without entry of the requested relief, Defendants' sale of infringing products will continue to lead prospective purchasers and others to believe that Defendants' low-quality knockoffs have been manufactured by or emanate from Plaintiff, when in fact, they have not. Therefore, entry of an *ex parte* order is necessary to protect Plaintiff's trademark and trade dress rights, to prevent further irreparable harm to Plaintiff and the consuming public, and to preserve the status quo.  In view of the foregoing and consistent with previous similar cases, Plaintiff respectfully requests that this Court enter the proposed order submitted concurrently herewith.


Dated: March 18, 2021                                 Respectfully submitted,


                                                      */s/ Edward Chen*
                                                      EDWARD CHEN (CA BAR NO. 312553)
                                                      YK LAW LLP
                                                      125 SOUTH WACKER DR. SUITE 300
                                                      CHICAGO, ILLINOIS 60606
                                                      (213) 401-0970
                                                      ECHEN@YKLAW.US

                                                      *ATTORNEYS FOR PLAINTIFF JIAXING ZICHI TRADE CO., LTD*

31

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of March 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

By:    */s/ Edward Chen*
           Edward Chen